## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

SARAH L. BROOKS, individually, and on behalf of all others similarly situated,

     *Plaintiffs*,

 *v.*

WILLIAM D. BOYCE TRUST 2350 u/a/d 10/1908, WILLIAM D. BOYCE TESTAMENTARY TRUST 3649 u/a/d 6/1929, WILLIAM D. BOYCE TESTAMENTARY TRUST 3650 u/a/d 6/1929, LEE W. MUELLER, MICHAEL W. d'AVENAS, STEPHEN B. HULTBERG, JP MORGAN CHASE & CO., BOYCE TRUST HYDRO PROPERTY 2350 LLC, BOYCE TRUST HYDRO PROPERTY 3649 LLC, BOYCE TRUST HYDRO PROPERTY 3650 LLC, BOYCE HYDRO POWER LLC, BOYCE HYDRO LLC, BOYCE MICHIGAN LLC, EDENVILLE HYDRO PROPERTY LLC,

     *Defendants*.

Case No.:

Hon.

---

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Sarah L. Brooks ("Plaintiff"), individually and on behalf of a putative class of all similarly situated persons ("Class Members" or "Class"), by and through her undersigned counsel sue Defendants William D. Boyce Trust 2350 u/a/d 10/1908, William D. Boyce Testamentary Trust 3649 u/a/d 06/1929, William D.

Boyce Testamentary Trust 3650 u/a/d 06/1929 (together, "Trust Defendants"), Lee W. Mueller, Michael W. d'Avenas, Stephen B. Hultberg, JPMorgan Chase & Co. (together, "Trustee Defendants"), and Boyce Trust Hydro Property 2350 LLC, Boyce Trust Hydro Property 3649 LLC,  Boyce Trust Hydro Property 3650 LLC, Boyce Hydro Power LLC, Boyce Hydro LLC, Boyce Michigan LLC, and Edenville Hydro Property LLC (together, "LLC Defendants"), and, based upon personal knowledge and on investigation of counsel and review of public documents and information, allege as follows:

## INTRODUCTION

1.      On or about May 19, 2020, the Edenville Dam, an embankment dam located at the confluence of the Tittabawassee and Tobacco Rivers in Gladwin and Midland Counties, Michigan, failed, resulting in catastrophic flooding to downstream areas. The Edenville Dam failed so completely that the downstream Sanford Dam suffered overtopping damage before breaching as well, causing areas even further downriver to be engulfed by floodwaters.

2.      As a result of the cascading failure of the Edenville and Sanford Dams, more than 11,000 people living in Gladwin, Midland, and Saginaw Counties near Sanford Lake and the Tittabawassee River were forced to flee from imminent danger and seek higher ground. Many of their homes, businesses, and property have been completely destroyed.  Thousands of others who have not evacuated or experienced

property damage have nevertheless had their daily lives upended as the floodwaters continue to damage essential infrastructure in the area, such as bridges and roads, and have interfered with essential utilities services like sanitary sewage.

3.     In many cases, evacuees fleeing the rising floodwaters have been cast further into harm's way. Like the rest of the country, the State of Michigan is in the midst of the COVID-19 Pandemic, with restrictions in place on movement and economic activity that severely limit the ability of evacuees to find safety outside of their homes. In the words of Michigan Governor Gretchen Whitmer, "to go through this in the midst of a global pandemic is almost unthinkable."

4.     The citizens and businesses of Gladwin, Midland, and Saginaw Counties are devastated. Their lives have been turned upside down, their homes and property destroyed, and their livelihoods devastated.  The full scope of their losses has not yet come into view, and as the floodwaters continue to recede, they face the growing uncertainty of months, if not years, of rebuilding and restoration.

5.     This devastating event and the catastrophic consequences suffered by the communities harmed were entirely preventable.  At all times relevant hereto, and as discussed in greater detail below, Defendants owned and operated the Edenville and Sanford Dams at the center of this disaster. They indisputably knew for years that these Dams were inadequate, decrepit, unstable, unsafe, and would fail under predictable conditions. The calamity befalling the citizens and businesses of

Gladwin, Midland, and Saginaw counties is the direct and foreseeable result of the Defendants' willful, wanton, egregious, malicious, and despicable disregard to their safety.

6.      Plaintiffs bring this class action against Defendants, the owners and operators of the failing dams in Edenville and Sanford Dams, to recover all damages including, but not limited to, exemplary damages, resulting from Defendants' dangerous and reckless disregard for their safety.

## **PARTIES**

7.      Plaintiff Sarah L. Brooks is a citizen of Michigan and a resident of Saginaw County. As a result of the failure Defendants' dams, her home has been flooded, her property destroyed, and she was forced to evacuate from her home.

8.      Defendant William D. Boyce Trust 2350 u/a/d 10/1908 is an Illinois-registered Trust. It is a member owner of each of the LLC Defendants, in conjunction with the other Trust Defendants. At all times relevant, defendant William D. Boyce Trust 2350 has been engaged in a joint venture with the other Trust Defendants and the LLC Defendants to own and operate the Edenville and Sanford Dams. Additionally, at all times relevant hereto, the LLC Defendants have been alter egos of the Trustee Defendants and the Trust Defendants.

9.      Defendant William D. Boyce Trust 3649 u/a/d 06/1929 is an Illinois-registered Trust. It is a member owner of each of the LLC Defendants, in

3

conjunction with the other Trust Defendants. At all times relevant, defendant William D. Boyce Trust 3649 has been engaged in a joint venture with the other Trust Defendants and the LLC Defendants to own and operate the Edenville and Sanford Dams. Additionally, at all times relevant hereto, the LLC Defendants have been alter egos of the Trustee Defendants and the Trust Defendants.

10.    Defendant William D. Boyce Trust 3650 u/a/d 06/1929 is an Illinois-registered Trust. It is a member owner of each of the LLC Defendants, in conjunction with the other Trust Defendants. At all times relevant hereto, defendant William D. Boyce Trust 3650 has been engaged in a joint venture with the other Trust Defendants and the LLC Defendants to own and operate the Edenville and Sanford Dams. Additionally, at all times relevant hereto, the LLC Defendants have been alter egos of the Trustee Defendants and the Trust Defendants.

11.    Defendant Lee W. Mueller is a citizen of Nevada. He is sued personally as co-trustee and beneficiary of the Trust Defendants, and personally as member and co-manager of the LLC Defendants. At all times relevant hereto, Lee W. Mueller has been engaged in a joint venture with the Trust Defendants and LLC Defendants to own and operate the Edenville and Sanford Dams. Additionally, at all times relevant hereto, the LLC Defendants have been alter egos of Lee W. Mueller.

12.    Defendant Michael d'Avenas is a citizen of California. He is sued personally as co-trustee and beneficiary of the Trust Defendants.  At all times

4

relevant hereto, Michael d'Avenas has been engaged in a joint venture with the Trust Defendants and LLC Defendants to own and operate the Edenville and Sanford Dams. Additionally, at all times relevant hereto, the LLC Defendants have been alter egos of Michael d'Avenas.

13.     Defendant Stephen B. Hultberg is a citizen of Nevada.  He is sued personally as co-trustee and beneficiary of the Trust Defendants, and personally as member and co-manager of the LLC Defendants. At all times relevant hereto, Stephen B. Hultberg has been engaged in a joint venture with the Trust Defendants and LLC Defendants to own and operate the Edenville and Sanford Dams. Additionally, at all times relevant hereto, the LLC Defendants have been alter egos of Stephen B. Hultberg.

14.     Defendant JPMorgan Chase & Co. is a Delaware Corporation with its principal place of business in New York. Upon information and belief, JPMorgan Chase & Co. is the successor in interest to Bank One Corporation and/or Bank One Trust Company NA following their merger in or about 2004. It is sued personally and directly as a co-trustee of the Trust Defendants.  At all times relevant hereto, JPMorgan Chase & Co. has been engaged in a joint venture with the Trust Defendants and LLC Defendants to own and operate the Edenville and Sanford Dams. Additionally, at all times relevant hereto, the LLC Defendants have been alter egos of JPMorgan Chase & Co.

15.     Defendant Boyce Trust Hydro Property 2350 LLC is a Michigan limited liability company with its primary place of business in Gladwin County. It is wholly owned and operated by the Trust Defendants, and an alter ego of the Trust Defendants and Trustee Defendants. At all times relevant hereto, it has been in a joint venture with the other LLC Defendants and Trust Defendants to own and operate the Edenville and Sanford Dams.

16.     Defendant Boyce Trust Hydro Property 3649 LLC is a Michigan limited liability company with its primary place of business in Gladwin County. It is wholly owned and operated by the Trust Defendants, and an alter ego of the Trust Defendants and Trustee Defendants. At all times relevant hereto, it has been in a joint venture with the other LLC Defendants and the Trust Defendants to own and operate the Edenville and Sanford Dams.

17.     Defendant Boyce Trust Hydro Property 3650 LLC is a Michigan limited liability company with its primary place of business in Gladwin County. It is wholly owned and operated by the Trust Defendants, and an alter ego of the Trust Defendants and Trustee Defendants. At all times relevant hereto, it has been in a joint venture with the other LLC Defendants and the Trust Defendants to own and operate the Edenville and Sanford Dams.

18.     Defendant Boyce Hydro Power LLC is a Michigan limited liability company with its primary place of business in Gladwin County. It is wholly owned

6

and operated by the Trust Defendants, and an alter ego of the Trust Defendants and Trustee Defendants. At all times relevant hereto, it has been in a joint venture with the other LLC Defendants and the Trust Defendants to own and operate the Edenville and Sanford Dams.

19.     Defendant Boyce Hydro LLC is a Michigan limited liability company with its primary place of business in Gladwin County. It is wholly owned and operated by the Trust Defendants, and an alter ego of the Trust Defendants and Trustee Defendants. At all times relevant hereto, it has been in a joint venture with the other LLC Defendants and the Trust Defendants to own and operate the Edenville and Sanford Dams.

20.     Defendant Boyce Michigan LLC is a Michigan limited liability company with its primary place of business in Gladwin County. It is wholly owned and operated by the Trust Defendants, and an alter ego of the Trust Defendants and Trustee Defendants. At all times relevant hereto, it has been in a joint venture with the other LLC Defendants and the Trust Defendants to own and operate the Edenville and Sanford Dams.

21.     Defendant Edenville Hydro Property LLC is a Michigan limited liability company with its primary place of business in Gladwin County. It is wholly owned and operated by the Trust Defendants, and an alter ego of the Trust Defendants and Trustee Defendants. At all times relevant hereto, it has been in a joint venture with

the other LLC Defendants and the Trust Defendants to own and operate the Edenville and Sanford Dams.

22.    In law and in fact, all of the Defendants own, operate, fund and maintain the Dams.

23.    Upon information and belief, the LLC Defendants had no separate existence other than as conduits for the Trust Defendants and Trustee Defendants, and the Trust Defendants and Trustee Defendants consistently held themselves out as individually conducting business affairs in connection with the ownership and operation of the Edenville and Sanford Dams without the proper use of corporate names and without identifying that their actions were taken as officers or employees of the various, respective LLC Defendants.

24.    Upon information and belief, the LLC Defendants:

a.    were insufficiently capitalized and maintained insufficient assets, including liability insurance coverage, considering the ultrahazardous ownership and operation of the Edenville and Sanford Dams as alleged more fully herein;

b.    were intermingling funds between and among themselves and the personal and/or trust assets of the Trust Defendants and Trustee Defendants in the ownership and operation of the Edenville and Sanford Dams;

8

    c.       failed to have any functioning officers, directors, members and managers;

    d.       failed to observe corporate formalities evidencing a distinction in fact between themselves and the Trust Defendants and Trustee Defendants;

    e.       were mere instrumentalities of the Trust Defendants and Trustee Defendants in the ownership and operation of the Edenville and Sanford Dams; and

    f.       were created, maintained and utilized for the express or implied purpose of committing negligent, careless, reckless, willful, wanton and malicious acts of wrongdoing with impunity by attempting to insulate the Trust Defendants and Trustee Defendants from potential liability in connection with the ownership and operation of the Edenville and Sanford Dams, thereby exposing Plaintiffs and all others similarly situated to unjust losses and damages as alleged herein.

25.    Additionally, the LLC Defendants, Trust Defendants and Trustee Defendants constituted a joint venture in connection with the Edenville and Sanford Dams inasmuch as they agreed to undertake the ownership and operation of the Dams jointly for the purpose of sharing associated profits and losses, and in

connection therewith, each contributed their respective skills, property or resources in exercising control or a right of control over the Dams.

## JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are more than 100 putative class members, and Plaintiffs (and many Class Members) and Defendants are citizens of different states.

27.    This Court has jurisdiction over all Defendants pursuant to, *inter alia*, Mich. Comp. Laws §§ 600.705(1), 600.705(2) and 600.705(3) because all Defendants: (1) regularly conduct and transact business within this District; (2) own and operate the Edenville and Sanford Dams in this District; and (3) committed negligent, careless, reckless, willful, wanton and malicious acts of wrongdoing resulting in a tort in this District. Through these regular business operations in this District, Defendants intentionally and regularly avail themselves of the markets and jurisdiction in this District, conferring this Court with personal jurisdiction over Defendants consistent with Michigan law and the Due Process Clause of the U.S. Const. amend XIX.

28.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action

occurred in this District, Defendants' operations in this District resulted in catastrophic flooding within this District, causing harm to Plaintiffs and Class Members residing in this District.

## STATEMENT OF FACTS

**A.    THE FLOODS**

29.    Plaintiff and members of the proposed Class live near Sanford Lake and the Tittabawassee River in Gladwin, Midland, and Saginaw Counties.

30.    On May 19, 2020, foreseeably heavy spring rains caused the Edenville Dam to fail, unleashing a deluge of floodwaters downriver through the Sanford Lake and Tittabawassee Rivers. This torrent overtopped the Sanford Dam downstream, and further endangering the Plaintiff and the proposed Class Members.

31.    As up to 30 feet of floodwaters raced into neighborhoods near these waterways, resident Class Members were forced into the night without notice and without the opportunity to collect their belongings. More than 11,000 residents were compelled to flee, abandoning their homes and property to the inundation.

32.    The chaos of this sudden evacuation caused great anguish and turmoil for the entire community, who fear for the safety of their families as well as the safety of their property, belongings, and possessions, and who doubt their ability to return to the peaceable lives they formerly lived.

33.     Even those Class Members who were not actively forced to flee from the floodwaters suffered, and in fact continue to suffer untold disruption to their daily lives as critical infrastructures, such as roads and bridges, as well as essential services, like sanitary sewage, have been impacted, deprived, limited or otherwise cut off.

34.     To this day, the floodwaters have not yet fully receded, and the full extent of damage to property, as well as the scope of rebuilding and restoration efforts, is not yet known.  While only time will tell the full extent of the Class' losses from this catastrophic – yet easily preventable – flooding, it is virtually certain that Class Members' lives will not return to normal for many months, if not years.

35.     What is worse, this disaster cast Plaintiff and Class Members into the waiting arms of the global COVID-19 Pandemic. At the time of the May 2020 floods, the State of Michigan remained under strict restrictions of personal movement and economic activity, severely limiting the ability of residents to find food, shelter and other necessary provisions.  Mandates were in place to protect citizens from the Pandemic by limiting contact and the spread of COVID-19.

36.

**B.    DEFENDANTS' LONGSTANDING, CONSCIOUS DISREGARD FOR THE GRAVE THREAT POSED TO PUBLIC SAFETY BY THE EDENVILLE AND SANFORD DAMS.**

37.     Defendants had been warned for years that this very type of catastrophic flood would happen. Since Defendants' acquisition of the Edenville and Sanford

Dams in or about 2006, the Federal Energy Regulatory Commission ("FERC") repeatedly warned that the Edenville Dam was inadequate, unsafe, prone to catastrophic failure, and a major hazard to life and property downstream.

38.   The hazards posed by the Edenville Dam were many. Specifically, it was known since at least July 2004 that the Dam would not be able to handle a Probable Maximum Flood ("PMF") and/or Probable Maximum Precipitation ("PMP") event due to inadequate spillway capacity. While federal regulations require hydroelectric dams to be designed to withstand anticipate flooding scenarios, the Edenville Dam was only capable of withstanding about half such an amount.

39.   Between the time they first assumed ownership and responsibility for the dam and the present, Defendants refused to pay for much-needed repairs and upgrades, despite knowing full well that the Edenville Dam could fail at any moment, endangering life and property downstream.

40.   Instead of performing these critically-important repairs and upgrades, Defendants instead intentionally sought to hide the further deteriorating condition of the Edenville Dam.

41.   For example, in 2015, Defendants were cited by FERC for concealing the failure of a spillway wall, and secretly trying to repair the failing wall without reporting this to FERC, without submitting plans and specifications for such repairs, and without submitting to quality control inspections.  Even after being informed of

these violations, Defendants proceeded with further unauthorized repairs to the failing spillway wall.

42.    Similarly, FERC also found that Defendants had engaged in a significant amount of unauthorized earth-moving absent appropriate erosion control measures and without following regulatory directives or filing soil erosion control plans.

43.    In light of this flagrant disregard for FERC's regulatory authority and the basic principles of dam safety, it is no surprise that Defendants have even failed to submit acceptable Public Safety and Emergency Actions Plans since 2013.

44.    By 2017, FERC had seen enough of the Defendants' negligent, careless, reckless, willful, wanton and malicious acts, and noted that Defendants' actions had shown a pattern of delay and indifference to addressing dam safety requirements.

45.    Finally, in 2018, due to the extreme hazards posed by the condition of the Edenville Dam and Defendants' callous indifference towards the lives and properties of others, FERC revoked Defendants' license to generate hydroelectric power from the Dam. FERC determined that Defendants "**knowingly and willfully refused to comply with major aspects of its license**" and had "**repeatedly failed to comply**" with directives to "**develop and implement plans and schedules to address the fact that the [Edenville Dam's] spillways are not adequate to pass the probable maximum flood,** ***thereby creating a grave danger to the public***". In

doing so, FERC observed that "**the licensee has displayed a history of obfuscation and outright disregard of its obligations. We do not often revoke a license, but the licensee has left us with no other way to vindicate the public interest here.**"

46.    Even though FERC revoked Defendants' license to use the Edenville Dam to generate hydroelectric power, it was powerless to outright strip Defendants of their ownership of the Dams and instead transferred regulatory authority over the structures to the Michigan Department of Environmental, Great Lakes and Energy ("EGLE").

47.    Following this transition of regulatory authority from FERC to EGLE in 2018, Defendants were still responsible for inspecting, maintaining and repairing the Dams' physical structures in order to keep downstream residents, businesses and properties safe from the release of water.

48.    However, there is no evidence that Defendants undertook any safety upgrades in the time between the revocation of its hydroelectric generating license and the May 2020 floods.

49.    To the contrary, despite their joint venture and substantial, intertwined assets, the Defendants repeatedly pleaded poverty to their regulators – all the while refusing to disclose their actual financial resources under the guise of "privacy and confidentiality" – arguing that it is the resident Class Members, themselves, who

must bear the expense of maintaining and repairing these private Dams for their own safety.

50.     Unfortunately, but predictably, the Defendants' repeated failures to exercise even scant care in the ownership and operation of the Dams resulted in the Edenville Dam's failure on May 19, 2020, when heavy rains throughout the region overcame inadequate spillway capacity and exposed long-standing structural flaws.

51.     The resulting cascade of floodwaters eventually reached a height of more than 35 feet, overtopping the similarly-dilapidated and inadequate Sanford Dam and unleashing a devastating torrent of water that caused catastrophic damage to downstream properties, businesses and residents like Plaintiffs and the other Class Members.

## C.    NAMED PLAINTIFF'S LOSSES AND DAMAGES

52.     Plaintiff and Class Members were going about their day-to-day lives when the floodwaters unleashed by the Dam failures rolled through their neighborhoods. Within hours, their homes, properties and businesses were inundated.

53.     Plaintiff Brooks's home was filled with floodwaters. At least five feet of water filled her basement, ruining major appliances, the home's furnace, and valuable personal property. Her home, along with the personal property contained

therein, has been completely destroyed.  She has been forced to evacuate, unsure of where she will live or how she will pick up the pieces.

## CLASS ALLEGATIONS

54.     Plaintiff seek relief on behalf of herself and as a representative of all others who are similarly situated. Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of a class defined as follows:

> Excepting any claims for personal bodily injury, all persons who resided in, owned property and/or owned or operated a business within Gladwin, Midland, or Saginaw County, Michigan, on May 2019, 2020, who suffered losses, including property damage, or were forced to evacuate, due to the failure of the Edenville and Sanford Dams.

55.     In all cases, those individuals claiming personal bodily injury as the direct, foreseeable and proximate result of the May 2020 floods described above are excepted from the Class only to the extent their claimed damages arise out of and relate solely and exclusively to physical injury to the person.

56.     Excluded from the Class are Defendants and any of their affiliates, parents or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

57.     Plaintiff hereby reserves the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct discovery.

58.     The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

59.     **Numerosity. Fed. R. Civ. P. 23(a)(1).**  Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical.  While the exact number of Class Members is unknown to Plaintiff at this time, the proposed Class includes more than 11,000 residents who were forced to evacuate due to the failure of the Edenville and Sanford Dams. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

60.     **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).**  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class members. The common questions include:

      a.     Whether Defendants' conduct was negligent or otherwise tortious;

      b.     Whether Defendants owed a duty of care to Plaintiff and the Class;

      c.     Whether the duty of care owed to the Class included the duty to protect Plaintiff and the Class against unreasonable harm

18

resulting from the failure of the Edenville and Sanford Dams; and

     d.     Whether Plaintiff and the Class are entitled to relief.

61.    **Typicality. Fed. R. Civ. P. 23(a)(3).**  Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of the putative Class Members.  Plaintiff resides in the areas affected by the May 2020 floods, suffered property damage, and was forced to evacuate. Plaintiff suffered damages and injuries are akin to those of Class Members, and Plaintiff seeks relief consistent with the relief of Class Members.

62.    **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and committed to pursuing this matter against Defendants to obtain relief for the Class.  Plaintiff has no conflicts of interest with the Class.  Plaintiff's Counsel are competent and experienced in successfully litigating class actions, including large-scale disaster litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of Class Members.

63.    **Superiority. Fed. R. Civ. P. 23(b)(3).**  Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when

damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

64. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

65. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

66. Finally, all members of the proposed Class are readily ascertainable as they are all current or former residents of defined tracts. Class Members can be

identified and their contact information ascertained for the purpose of providing notice to the Class.

**COUNT I**
**NEGLIGENCE – ALL DEFENDANTS**

67.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 69 as if fully set forth herein.

68.     Defendants each directly owed Plaintiff and Class Members a duty to maintain and operate the Edenville and Sanford Dams in a manner which would not cause Plaintiff and Class Members injury or harm.

69.     Defendants were each directly negligent in breaching their duty of care to Plaintiff and the Class Members by, among other acts and omissions:

    a.     failing to appropriately appreciate and classify the extreme downstream hazards posed by the condition of the Dams;

    b.     ignoring the extreme downstream hazards posed by the condition of the Dams;

    c.     failing to design, implement, enforce and revise adequate standard operating procedures for the Dams;

    d.     failing to design, implement, enforce and revise adequate monitoring procedures for the Dams;

    e.     failing to obtain and employ adequate monitoring instruments at the Dams;

21

f.    failing to design, implement, enforce and revise adequate inspection procedures for the Dams;

g.    failing to regularly, timely and adequately conduct inspections of the Dams including, but not limited to, the Dams' access roads and ways, upstream slope, crest, downstream slope, left and right abutments, spillways, outlets, drains and reservoir areas, approach channels, stilling basins, discharge channels, control features, erosion protections and side slopes;

h.    failure to regularly, timely and adequately inspect and address Dam failures from seepage and piping, foundational issues and overtopping;

i.    failing to engage competent professionals to conduct regular, timely and adequate inspections of the Dams;

j.    failing to develop, document, implement, enforce and revise an adequate Safety Program;

k.    failing to develop, document, implement, enforce, practice and revise an adequate Emergency Action Plan;

l.    failing to timely identify the potential for a flood event;

m.    failing to develop and implement adequate measures or protocols for communicating the imminence or occurrence of a flood event to downstream stakeholders;

n.    failing to provide for or implement appropriate flood event mitigation measures including, but not limited, adequate spillways to address a PMF and/or PMP;

o.    failing to provide for or implement appropriate flood event response measures;

p.    failing to timely and adequate perform repairs, maintenance and/or safety upgrades to the Dams as necessary to protect downstream stakeholders;

q.    failing to respond to local, state and federal authorities' regulations, notices, citations or violations regarding the structure, condition or design of the Dams;

r.    failing to ensure or appropriate sufficient capitalization to implement adequate operational, safety and emergency response measures, including repairs, maintenance and/or safety upgrades to the Dams;

s.    failing to ensure the appropriate number of trained, on-site staff to identify and respond to a potential flood event;

    t.      failing to retain competent professionals to inspect, maintain or repair the Dams;

    u.      operating the Dams without adequate education, training or experience regarding dam design, construction and safety;

    v.      concealing the deterioration and failures of the Dams;

    w.      making unauthorized or unapproved changes and repairs to the Dams and their surrounding areas, including engaging in earthmoving that contributed to increased erosion; and

    x.      failing to implement adequate information management systems and/or recordkeeping to track the condition of the Dams and their surrounding areas over time.

70.    Defendants each owed Plaintiff and Class Members a duty of reasonable care to prevent unreasonable harm commensurate with the risk of owning and operating the Edenville and Sanford Dams.

71.    Given the likelihood of failure under predictable flooding conditions, Defendants each had a duty to make improvements necessary to prevent such catastrophic failure.

72.    As a direct and proximate result of Defendants' carelessness, negligence, recklessness, and willful and wanton indifference, Plaintiff and Class Members suffered damages as alleged herein, including evacuation and loss of use

and enjoyment of their property, relocation costs, and replacement costs for destroyed real and personal property. The displacement, inconvenience, and relocation of residents are a direct and proximate result of each Defendants' negligence.

73.    As a direct and proximate result of Defendants' carelessness, negligence, recklessness, and willful and wanton indifference, Plaintiff and Class Members suffered and will continue to suffer the loss of the quiet use and enjoyment of their properties.

74.    As a direct and proximate result of Defendants' carelessness, negligence, recklessness, and willful and wanton indifference to the rights of Plaintiff and Class Members, Plaintiff and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, diminution of the value of real property, the cost to repair or replace destroyed real and personal property, plus the value of their lost use and enjoyment of their property.

75.    As a direct and proximate result of Defendants' carelessness, negligence, recklessness, and willful and wanton indifference, Plaintiff and Class Members suffered aggravation, annoyance, discomfort, disgrace, anguish, exclusion from society, humiliation, inconvenience, indignation, insult, mental anxiety, outrage, sorrow and worry.

76.    As a direct and proximate result of Defendants' carelessness, negligence, recklessness, and willful and wanton indifference to the rights of Plaintiff

and Class Members, Plaintiff and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, loss of business income, loss of profits, loss of goodwill, extra commercial operating expenses and loss of business property and/or equipment.

77. Defendants' behavior was careless, negligent, grossly negligent, reckless and exhibited willful and wanton disregard for the rights of Plaintiff and Class Members.

78. Defendants are liable to Plaintiff and Class Members for all damages arising from their carelessness, negligence, recklessness, and wanton and willful indifference, including compensatory and exemplary damages and attorneys' fees.

## COUNT II
## ULTRAHAZARDOUS ACTIVITY/STRICT LIABILITY – ALL DEFENDANTS

79. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 69 as if fully set forth herein.

80. At all times relevant to this action, Defendants had supervision, custody, and control of the Edenville and Sanford Dams.

81. At all times relevant to this action, Defendants were under a continuing duty to protect Plaintiff and Class Members from uncontrolled escape of floodwaters and unimpeded flow of floodwaters.

82.   Defendants were engaged in ultra-hazardous activities by impounding surface waters in dams, and operating the Edenville and Sanford Dams.

83.   Plaintiff and Class Members have suffered harm from Defendants' failure to contain floodwaters, and the resultant catastrophic flooding and property destruction.

84.   The injuries sustained by Plaintiff and the Class as a result of Defendants' discharges and failure to contain floodwaters were the proximate result of Defendants' activities of impounding surface waters with dams.

85.   The harm to Plaintiff and the Class was and is the kind of harm that would be reasonably anticipated as a result of the risks created by impounding floodwaters with dams.

86.   The activities conducted by Defendants are exceedingly dangerous and offer little or no value to the surrounding community.

87.   Because these activities are ultrahazardous, Defendants are strictly liable for any injuries proximately resulting therefrom.

88.   Defendants' operation of the Edenville and Sanford Dams and resulting discharges was and remains a substantial factor in causing the harms suffered by Plaintiff and the Class.

89.    Defendants are liable to Plaintiff and Class Members for all damages arising from this ultra-hazardous activity, including all compensatory damages, exemplary damages, attorney's fees and costs.

## COUNT III
## CONTINUING PRIVATE NUISANCE – ALL DEFENDANTS

90.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 69 as if fully set forth herein.

91.    Defendants' failure to maintain and operate the Edenville and Sanford Dams has created an ongoing condition that is dangerous and interferes with the comfortable enjoyment of life and property. Absent abatement, Defendants' actions and inactions may result in additional catastrophic damage. As a result of Defendants' actions and inactions, Plaintiff and Class Members have suffered a loss of use and enjoyment of their property, and have lost the peace of mind that they can occupy their properties safely.

92.    Defendants' failure to maintain its Dams made them prone to failure and catastrophic consequences.

93.    Defendants operated the Edenville and Sanford Dams in a manner that would foreseeably cause catastrophic failure, flooding, property damage, and endangerment to human life.

94.    The seriousness and gravity of the harm associated with Defendants' maintenance and operation of the Edenville and Sanford Dams outweigh the public

benefit of Defendants' conduct. There is no social utility associated with the uncontrolled and unimpeded release of floodwaters into residential areas.

95.    Plaintiff and the Class have suffered and absent abatement will continue to suffer harm and injury to their residential properties to which they did not consent, and which is different from the type of harm suffered by the general public.

96.    Defendants' conduct was a substantial factor in causing harm to Plaintiff and the Class to suffer and to continue to suffer economic harm, injury, and losses, including loss of use and enjoyment of property, destruction of real and personal property, diminution in property values, loss of business income, loss of profits, loss of goodwill, extra commercial operating expenses and loss of business property and/or equipment. Plaintiff and the Class are entitled to damages for all such past and present injuries.

97.    Plaintiff are informed and believes, and on that basis allege, that the nuisance is continuing and abatable.

## COUNT IV
## CONTINUING PUBLIC NUISANCE – ALL DEFENDANTS

98.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 69 as if fully set forth herein.

99.    Plaintiff and all others similarly situated own, occupy and/or use property at and/or near the area where the May 2020 floodwaters discharged, and at

29

all relevant times had the right to such ownership, occupancy or use without interference from the Defendants.

100.   Defendants owed a duty to the public, including Plaintiff named herein and all others similarly situated, to conduct their business, specifically the maintenance, operation and/or repair of the Edenville and Sanford Dams, in a manner that did not threated harm or injury to the public.

101.   By acting and/or failing to act as alleged above, Defendants created a condition that was harmful to the health of the public, including Plaintiff and all others similarly situated, and that significantly interfered with public health, safety, peace, comfort and convenience, as well as the quiet ownership, occupancy, use and enjoyment of property.

102.   The hazardous conditions that Defendants created and/or permitted to exist affected a substantial number of people within the general public in a significant and similar manner, including Plaintiffs and all other similarly situated, and therefore constituted a public nuisance.

103.   As a direct, foreseeable and proximate result of the Defendants' conduct, Plaintiff and all others similarly situated suffered a harm that is different from the type of harm suffered by the general public in that they suffered the damages described above.

104.   As a further direct, foreseeable and proximate result of the Defendants' conduct, Plaintiff and all others similarly situated have suffered, and will continue to the damages described above.

## COUNT V
## WILLFUL AND WANTON CONDUCT – ALL DEFENDANTS

105.   Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 69 as if fully set forth herein.

106.   At all times relevant, Defendants owed a duty to refrain from willful and wanton conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and those living downstream from the Edenville and Sanford dams.

107.   Notwithstanding its duty, Defendants breached their duty by, among other acts and omissions:

  a.   failing to appropriately appreciate and classify the extreme downstream hazards posed by the condition of the Dams;

  b.   ignoring the extreme downstream hazards posed by the condition of the Dams;

  c.   failing to design, implement, enforce and revise adequate standard operating procedures for the Dams;

  d.   failing to design, implement, enforce and revise adequate monitoring procedures for the Dams;

31

e.    failing to obtain and employ adequate monitoring instruments at the Dams;

f.    failing to design, implement, enforce and revise adequate inspection procedures for the Dams;

g.    failing to regularly, timely and adequately conduct inspections of the Dams including, but not limited to, the Dams' access roads and ways, upstream slope, crest, downstream slope, left and right abutments, spillways, outlets, drains and reservoir areas, approach channels, stilling basins, discharge channels, control features, erosion protections and side slopes;

h.    failure to regularly, timely and adequately inspect and address Dam failures from seepage and piping, foundational issues and overtopping;

i.    failing to engage competent professionals to conduct regular, timely and adequate inspections of the Dams;

j.    failing to develop, document, implement, enforce and revise an adequate Safety Program;

k.    failing to develop, document, implement, enforce, practice and revise an adequate Emergency Action Plan;

l.    failing to timely identify the potential for a flood event;

m.    failing to develop and implement adequate measures or protocols for communicating the imminence or occurrence of a flood event to downstream stakeholders;

n.    failing to provide for or implement appropriate flood event mitigation measures including, but not limited, adequate spillways to address a PMF and/or PMP;

o.    failing to provide for or implement appropriate flood event response measures;

p.    failing to timely and adequate perform repairs, maintenance and/or safety upgrades to the Dams as necessary to protect downstream stakeholders;

q.    failing to respond to local, state and federal authorities' regulations, notices, citations or violations regarding the structure, condition or design of the Dams;

r.    failing to ensure or appropriate sufficient capitalization to implement adequate operational, safety and emergency response measures, including repairs, maintenance and/or safety upgrades to the Dams;

s.    failing to ensure the appropriate number of trained, on-site staff to identify and respond to a potential flood event;

33

t.      failing to retain competent professionals to inspect, maintain or repair the Dams;

u.      operating the Dams without adequate education, training or experience regarding dam design, construction and safety;

v.       concealing the deterioration and failures of the Dams;

w.      making unauthorized or unapproved changes and repairs to the Dams and their surrounding areas, including engaging in earthmoving that contributed to increased erosion; and

x.      failing to implement adequate information management systems and/or recordkeeping to track the condition of the Dams and their surrounding areas over time.

108.   As a direct and proximate result of Defendants' willful and wanton conduct and conscious disregard for their rights, Plaintiff and Class Members have suffered and will continue to suffer the harms described above that have occurred or are reasonably certain to occur.

109.   Defendants are therefore liable to Plaintiff and Class Members for all damages arising willful and wanton conduct and conscious disregard for their rights, including all compensatory damages, exemplary damages, attorney's fees and costs.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all Class Members proposed in this Complaint, respectfully requests that the Court enter judgment in their favor and against each Defendant as follows:

a.  For an Order certifying the Class, as defined herein, and appointing Plaintiff and their Counsel to represent the Class;

b.  For damages, including compensatory and exemplary damages, in an amount determined just and reasonable;

c.  For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

d.  For prejudgment interest on all amounts awarded;

e.  For injunctive and declaratory relief, as allowed by law; and

f.  Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

SOMMERS SCHWARTZ, P.C.

Date:  June 2, 2020

By: */s/ Jason J. Thompson*
Jason J. Thompson (P47184)
Elaina S. Bailey (P82461)
One Towne Square, 17th Floor
Southfield, Michigan 48076
Phone: (248) 355-0300
jthompson@sommerspc.com
ebailey@sommerspc.com

**WEXLER WALLACE, LLP**
Edward A. Wallace
Kara A. Elgersma
55 W. Monroe St., Suite 3300
Chicago, IL  60603
(312) 346-2222
eaw@wexlerwallace.com
kae@wexlerwallace.com

*Attorney for Plaintiff and the*
*Putative Class Members*